11-0605

FILED
IN SUPREME COURT
OF TEXAS

AUG 31 2011

BLAKE HAWTHORNE, Clerk
By_____Deputy

ORIGINAL

In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-09-00519-CV
_____

BETTY LOU JASPER, Appellant

V.

THOMAS E. JASPER, Jr., Appellee

_____

On Appeal from the 356th District Court
Hardin County, Texas
Trial Cause No. 48884

_____

**MEMORANDUM OPINION**

Betty Lou Jasper appeals the trial court's judgment dividing the marital estate. Betty claims the trial judge "lacked subject matter jurisdiction." Betty also contends the trial court erred in not enforcing its own judgment, in denying her motion to strike, in "failing to render judgment[,]" and in awarding certain real property to Tommy Jasper.

The trial court had subject matter jurisdiction. Appellant presents no error requiring a reversal of the trial court's judgment. We therefore affirm the judgment.

1

## BACKGROUND

Betty and Tommy lived at her house in Lumberton, and then they moved to the property they purchased on Village Creek. They married. Over two years later, Tommy filed a petition for divorce. The divorce decree confirmed separate property and divided community property. Betty was ordered to vacate the Village Creek house within ten days of the "execution" of the decree of divorce. Law enforcement officers forced Betty to vacate the property. The trial court granted her motion for temporary injunction only in part to preserve the status quo. Her request for sanctions and attorney's fees was denied by the trial judge. Her motion for new trial was overruled by operation of law.

## SUBJECT MATTER JURISDICTION

Betty argues the judgment is void. She contends the assigned judge lacked subject matter jurisdiction. Betty asks whether the judge was concerned with his compensation. She questions his conduct. She asks for a new trial. Her brief on this issue does not cite any authorities supporting her request. *See* Tex. R. App. P. 38.1(i) (Argument must contain "appropriate citations to authorities[.]").

The Presiding Judge for the Second Administrative Judicial Region of Texas assigned a visiting judge to hear the case. *See* Tex. Gov't Code Ann. §§ 74.054, 74.056 (West 2005). Generally, visiting judges are assigned either to a particular case or for a period of time. *See In re Republic Parking Sys., Inc.*, 60 S.W.3d 877, 879 (Tex. App.— Houston [14th Dist.] 2001, orig. proceeding). For the purpose of the assignment, an

2

assigned judge has the power of a judge of the court to which he was assigned. *See* Tex. Gov't Code Ann. § 74.059(a) (West 2005); *see also Ex parte Eastland*, 811 S.W.2d 571, 572 (Tex. 1991) (orig. proceeding) (controlling effect of terms of assignment order).

In this case, the district judge requested that the presiding judge assign a visiting judge to the case. The order of assignment included in the clerk's record states that the "assignment begins the 11th day of June, 2009 and is for the primary purpose of presiding over Cause No. 48884; *Thomas E. Jasper, Jr. v. Betty Lu Jasper* [.]" The order also provided the assignment "shall continue as may be necessary for the assigned Judge . . . to complete trial of any case or cases begun during this assignment, and to pass on motions for new trial and all other matters growing out of accumulated business or cases heard before the Judge herein assigned, or until terminated by the Presiding Judge." The assigned judge had authority to render judgment in this case; the trial court had subject matter jurisdiction. Issue one is overruled.

EXECUTION

Betty contends the trial court erred in not enforcing its own judgment, which ordered Betty "to vacate the creek property home premises on or before ten (10) days after the execution of this Final Decree of Divorce." Ten days after the trial court signed the divorce decree, Betty was forced to leave the Village Creek property. She argues that the phrase "execution of the judgment" under Texas law means "after the mandate comes down" from this Court, and that she was forced out prematurely.

3

Betty relies on Rule 627 of the Texas Rules of Civil Procedure in arguing the writ of execution could not issue ten days after the trial court signed the divorce decree. The rule provides in part:

> If no supersedeas bond . . . has been filed and approved, the clerk of the court or justice of the peace shall issue the execution upon such judgment upon application of the successful party or his attorney after the expiration of thirty days from the time a final judgment is signed. If a timely motion for new trial or in arrest of judgment is filed, the clerk shall issue the execution upon the judgment on application of the party or his attorney after the expiration of thirty days from the time the order overruling the motion is signed or from the time the motion is overruled by operation of law.

Tex. R. Civ. P. 627.[1]

"[E]xecution of the judgment . . . is 'merely a direction to a ministerial officer to permit enforcement of the judgment.'" *In re Fischer-Stoker*, 174 S.W.3d 268, 272 (Tex. App.—Houston [1st Dist.] 2005, orig. proceeding) (quoting *English v. English*, 44 S.W.3d 102, 106 (Tex. App.—Houston [14th Dist.] 2001, no pet.)). The premature issuance of a writ of execution is not the ultimate issue in this case. Assuming the trial court used the word "execution" in the divorce decree in the same way the word is used in Rule 627, "'premature issuance of a writ of execution does not render the writ void, but is merely an irregularity, and the writ is voidable only.'" *Thomas v. Thomas*, 917 S.W.2d 425, 436 (Tex. App.—Waco 1996, no writ) (quoting *Interstate Life Ins. Co. v. Arrington*, 307 S.W.2d 146, 148 (Tex. Civ. App.—Texarkana 1957, no writ)). The

---

[1]Betty did not file a supersedeas bond.

underlying issue presented is whether the trial court erred in awarding Tommy the Village Creek property. If the judgment is correct, we should not reverse the judgment only because an officer executed the writ prematurely. We therefore turn to Betty's challenge to the award of the property.

DIVISION OF PROPERTY

Betty challenges the sufficiency of the evidence supporting the trial court's award of the Village Creek property to Tommy. She maintains the trial court failed to characterize the ownership interests of the parties in the Village Creek property and failed to apply a clear-and-convincing requirement for proof. Betty claims the trial court abused its discretion in giving the Village Creek property in its entirety to Tommy and in failing to award reimbursement to Betty.

Tommy testified that he was interested in the Village Creek property before he and Betty met, and he told the property owners that he was interested in purchasing the property. Prior to their marriage, the Village Creek property became available, and Betty and Tommy bought the property for around $25,000. They paid notes to the owner. The purchase included a 5.413 tract of land and an older mobile home.

After Tommy and Betty married, Val Hickman, a friend and real estate broker for whom Betty worked, told her about a newer mobile home that was for sale. Hickman agreed to pay off the remaining $19,500 note on the Village Creek property, and refinanced the property and the older mobile home for the Jaspers, along with the newer

5

mobile home and some renovation funds. Hickman paid Tommy's father, who helped renovate the home.

Hickman appraised the property at $65,000. At the time of trial, the Jaspers owed about $56,000 on the note. Hickman did not recall any down payment, but he credited the note with a commission check of $4,455 and then another "four or $5,000" commission check Betty had earned. He said he received a monthly check towards the note, but did not know who was making the payments.

According to Betty, Hickman applied a $4500 commission check towards new hardwood floors for the home. A commission check for $5,000 was applied for the down payment. The monthly note on the Village Creek property at the time of trial was $800. Betty claimed that payments for repairs to the home mostly came from her earnings, and that 99.9% of the work came from her. She also claimed she invested $10,000 in the shed on the property, and "cash" from the storage units to replace the windows in the old trailer on the property.

Tommy testified that he found the Village Creek property, and when asked if he could only be awarded one asset in the divorce what would he want, he answered he would want that property. He testified that Betty did not care as much about the property, and she had made the statement that she did not want to live there. Tommy improved the property by cutting trees and doing dozer work. He built a large hill to put the house on, and he added a storage building. He agreed that Betty initiated most of the improvements

to the mobile home, but explained that he and Betty made payments on the home and property.

In preparing for the divorce, Tommy told Betty he wanted the Village Creek property and she agreed; he testified "she found her a place and she moved away" to a house in Silsbee. Tommy explained that Betty then had a "total about-face" and moved back into the house in April 2009. At the time of trial, Betty was living at the Village Creek property with her grandchildren, who were placed in the home by Child Protective Services. She testified that from late 2007 until trial, Tommy paid the electricity bills and "things like that," and she paid the house note with her commissions. Later, she gave him the checkbook. Tommy began paying the note on the Village Creek property and the other bills out of their joint checking account.

Hickman advanced funds for Betty and another person to purchase a restaurant under the name of Laden Investments. The note to Hickman for the restaurant was for $252,500, and Betty and her partner were "50/50 partners." At the time of trial, $247,294 was owed on the note. A business was leasing the restaurant for $5,500 per month pursuant to a two-year lease agreement. Tommy introduced tax appraisal documents reflecting the value of the real property where the restaurant was located at over $250,000.

Betty testified that at the time Laden Investments purchased the restaurant, it was bringing in more than $80,000 a month, but within ten months of the purchase it was

unprofitable. She brokered the purchase and put $25,000 she received in commission payments towards the down-payment on the restaurant. After Hurricane Ike, the restaurant closed. She has heard that a lease contract is on the property for $5,500 per month.

Tommy testified that when he met Betty she was managing some storage buildings, and prior to their marriage she purchased the storage buildings. Betty stated at trial that when she purchased them "[t]hey were on the tax rolls for about 180 [thousand dollars]." During the marriage, Tommy and Betty finished the fourth set of storage units which amounted to around twenty or twenty-four units. Betty owed an $800 monthly note to the prior owners of the storage units. Betty told Tommy they were worth $400,000 or more. Tommy said he did not think the storage units were worth quite that much, but he consulted with other storage unit owners and "[t]hey thought that's what it was worth." Tommy had heard a rumor that the storage units had been foreclosed on and sold, but he did not know for sure. Tommy testified they made payments on the storage buildings while they were married. According to Betty, when she began putting all her funds into her failing restaurant, the foreclosure occurred because she could not pay the note on the storage units.

Tommy introduced a warranty deed for fourteen acres off Neyland Road in Hardin County that Laden Investments purchased for $31,500. The appraisal district valued the acreage at $42,390. Tommy's inventory showed that Betty and her partner each had

equity of approximately $6,000 in the property. Betty testified Laden Investments had only made eleven or twelve payments on the property and so she had minimal equity in the property.

Tommy testified that Betty has investment property "in the river bottom" and that there is a lawsuit "with the timber company and then the Texas Forest Service" regarding the property. Tommy assisted in the lawsuit by counting and measuring "a couple thousand" stumps, traveling to Lufkin and College Station, and meeting with the Forest Service. Betty explained that the 350 acres in the river bottom are worthless because "[i]t gets 20 feet of water on it."

Tommy introduced at trial an inventory of community property and separate property with estimates of market value. Tommy testified that as far as he knew Betty still owned her house in Lumberton. He described the house as a "[n]ice home in a subdivision" that was "a good home[,] [but] needs some work[.]" He testified that "[a]s far as [he] kn[e]w, [Betty] was making payments on it" and paying taxes on the property while they were married.

Betty testified she could not live at the home in Lumberton because it is uninhabitable, although she testified her daughter was living at the home at the time of trial. The plumbing is not working, there is no carpet, and the home contains black mold and termites. Hickman has a lien on the home. A tree on the property could fall on her

roof at any time. She testified the plumbing is repairable, the black mold is treatable, and for about $650 the tree could be cut down.

Betty explained Tommy was behind on his bills when they met. She helped him get out of debt. After they were married, she helped Tommy pay child support and financial assistance to his ex-wife. According to Betty, she contributed about $2,000 to $2,500 per month to a joint checking account, and he contributed $5,000 to $6,000 a month. She testified that between 2006 and 2008 she made $5,000 a month in commissions. She claimed she paid for the utilities and groceries. She testified they paid for "a multitude of things" for Tommy's children.

She testified she had between six and eight thousand dollars in the bank account at DuPont Federal Credit Union prior to the divorce. She believed that there should have been fifteen to sixteen thousand dollars in the account at the time of the divorce. Tommy testified that he had about $900 in his DuPont Federal Credit Union checking account. He asked the court to award him the checking account so he could pay bills.

In the award of community property to Tommy, the trial court included the Village Creek property, Tommy's retirement account, and the balance in his DuPont Federal Credit Union checking account. The trial court included in the award of community property to Betty the storage buildings in Lumberton, the restaurant business and commercial property in Lumberton, her civil tort claim, her interest in 14.3 acres off Neyland Road in Hardin County, and the interest in Laden Investments, Inc.

A trial court is charged with dividing the community estate in a just and right manner. Tex. Fam. Code Ann. § 7.001 (West 2006); *see also Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998) (Trial courts have wide latitude and discretion in dividing community property.). The trial court's division of property will not be disturbed on appeal unless there is a clear showing of abuse of discretion. *Cockerham v. Cockerham*, 527 S.W.2d 162, 173 (Tex. 1975); *see Mann v. Mann*, 607 S.W.2d 243, 245 (Tex. 1980).

Property possessed by either spouse on dissolution of marriage is presumed to be community property. Tex. Fam. Code Ann. § 3.003 (West 2006); *Tarver v. Tarver*, 394 S.W.2d 780, 783 (Tex. 1965). Parties claiming certain property as their separate property have the burden of rebutting the presumption of community property. *McKinley v. McKinley*, 496 S.W.2d 540, 543 (Tex. 1973) (citing *Tarver*, 394 S.W.2d at 783); *see also* Tex. Fam. Code Ann. § 3.003.

Property acquired before marriage is separate property. *See* Tex. Fam. Code Ann. § 3.001(1) (West 2006). Separate property will retain its character through a series of exchanges so long as the party asserting separate ownership can overcome the presumption of community property by tracing the assets on hand during the marriage back to property that, because of its time and manner of acquisition, is separate in character. *Cockerham*, 527 S.W.2d at 167. If the separate estates of both spouses acquired the property, then the property would be held by the two as tenants in common. *See id.* at 168.

11

Betty's arguments on appeal focus on the trial court's award of the Village Creek property to Tommy. The record shows that Tommy and Betty comingled their funds, that the property was refinanced during the marriage, that commissions Betty earned while married were credited to the note that included the newer mobile home, and that monthly payments were made on the note from comingled funds.

The newer mobile home on the property was purchased after the marriage and is presumed community property. Tex. Fam. Code Ann. § 3.003(a). Tommy and Betty initially obtained the 5.413 acres of real property and the older mobile home prior to their marriage. The property was refinanced after their marriage, and community property was used to pay the debt on the property.

When one marital estate improves another without receiving a benefit, a claim for reimbursement may arise. *See* Tex. Fam. Code Ann. § 3.402 (West Supp. 2010); *Vallone v. Vallone*, 644 S.W.2d 455, 458-59 (Tex. 1982). A trial court applies equitable principles in deciding whether to recognize a claim for reimbursement. *See id.* at 458; Tex. Fam. Code Ann. § 3.402(b). A decision to deny a claim for reimbursement is reviewed on appeal for abuse of discretion. *See Garcia v. Garcia*, 170 S.W.3d 644, 649 (Tex. App.— El Paso 2005, no pet.). Considering the circumstances of the joint purchase, the refinancing, the payments from community property, the commingling of assets, and the allocation of the debt to Tommy, Betty has not shown an abuse of discretion in the trial court's application of equitable principles.

12

A mischaracterization of a portion of property as community property does not require reversal of the judgment unless the mischaracterization had more than a *de minimis* effect on the division of property. *See Vandiver v. Vandiver*, 4 S.W.3d 300, 302 (Tex. App.—Corpus Christi 1999, pet. denied). The judgment makes Tommy responsible for the debt on the note. Betty does not provide a valuation of the entire marital estate that demonstrates why the division should be considered unjust. On this record, even though the trial court may have mischaracterized a portion of the property, Betty has failed to show the division of the marital estate was not just under the circumstances, or that the mischaracterization had more than a *de minimis* effect on the division. *See id.*

MOTION TO STRIKE

Betty argues that the trial court erred in not striking Tommy's testimony as to the value of the Village Creek property, and in not granting her motion for new trial. Betty argues Tommy's valuation of the property was insufficient because Tommy was asked on cross-examination whether his inventory values were guesses. He stated, "I'll tell you what, I'm a country boy, yeah, and if I was going to buy or sell something like that, yep, that's what you want to call it, that's what it is." When asked again if the inventory values were his best attempt at a guess, Tommy stated "Yes, sir. These right there, a benefit of a doubt, a good, cheap selling price to everything that's there."

An owner may be qualified to testify to the market value of his property. *See Porras v. Craig*, 675 S.W.2d 503, 504-05 (Tex. 1984). Betty cites *Porras* and argues that

Tommy's testimony should have been stricken because it was his personal valuation, and not the market value, of the Village Creek property. *See id.* ("Even an owner's testimony, however, is subject to some restrictions. In order for a property owner to qualify as a witness to the damages to his property, his testimony must show that it refers to market, rather than intrinsic or some other value of the property.") The Texas Supreme Court in *Porras* noted that the requirement that the owner's testimony must refer to market value "is usually met by asking the witness if he is familiar with the market value of his property." *Id.* at 505.

Tommy testified that he valued the items on his sworn inventory at what he considered market value for those items, and that he understood market value to be what a willing buyer would pay and a willing seller would take for the property. We are confident the court gave the testimony no more consideration than that to which it was entitled. The trial judge's refusal to strike the testimony is not reversible error under the circumstances. *See generally Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 669 (Tex. 1996) (legal sufficiency claim rejected where owner of property was instructed on the legal definition of fair market value and owner testified as to the market value of the damaged items).

Betty's issues relating to the Village Creek property do not present grounds requiring a reversal of the trial court's judgment. Issues two, three, four, five and six are overruled.

14

## RENDERING THE JUDGMENT

Betty maintains the trial court "failed to render a judgment and failed to enter a correct judgment." At the end of the trial, the trial court stated it would fax to both parties "what [the trial court] intend[ed] to do" no later than the next day. The record includes the divorce decree signed by the trial court. A correct judgment was rendered. *See Samples Exterminators v. Samples*, 640 S.W.2d 873, 875 (Tex. 1982); *Comet Aluminum Co. v. Dibrell*, 450 S.W.2d 56, 59 (Tex. 1970).

## BEST INTERESTS

Betty argues the trial court failed to consider the best interests of her grandchildren, who began living with her after she and Tommy separated. She does not include any record references indicating the court did not consider the best interests of the grandchildren. She does not cite any cases holding that the trial court was required to consider the best interests of grandchildren in dividing the marital estate. The award of the Village Creek property to Tommy is an insufficient basis for a reversal of the trial court's judgment. Issue seven is overruled. The judgment is affirmed.

AFFIRMED.

 

DAVID GAULTNEY
Justice

Submitted on November 29, 2010
Opinion Delivered June 16, 2011
Before McKeithen, C.J., Gaultney and Horton, JJ.